**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **United States of America ex rel.** ) | |
| **JESUS GOMEZ,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 10 C 1587 |
| ) | |
| **JESSE MONTGOMERY, Chief of Parole,** ) | |
| **Illinois Department of Corrections,** ) | |
| ) | |
| Respondent. ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Petitioner Jesus Gomez ("Gomez") has filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed below, the petition is denied.

I.

In September 2001, after a bench trial in the Circuit Court of Cook County, Illinois, Gomez was convicted of reckless homicide and aggravated fleeing or attempting to elude a police officer. The convictions stemmed from an incident that occurred on July 18, 2000. At about 10:00 p.m. that night, Chicago police officers Thomas Beyna ("Beyna") and Ben Martinez ("Martinez") were on duty in their police car when Gomez ran a red light and nearly collided with them. After a high-speed chase, Gomez crashed into a truck driven by Rene Bernal ("Bernal") at the intersection of 31st Street and Lawndale in Chicago. Beyna and Martinez exited their vehicle, drew their weapons, and told Gomez to get out of his car. Gomez

then restarted his ignition and sped away.

According to Beyna and Martinez, they spoke briefly with Bernal and were returning to their vehicle when they heard a loud crash. They drove about three blocks east to the intersection of 31st Street and Spaulding to find that Gomez had swerved into oncoming traffic and collided with a vehicle driven by Dalia Santillana ("Santillana"), who was killed as a result. Gomez was sentenced to ten years' imprisonment for the reckless homicide conviction, and a three-year concurrent sentence on the aggravated fleeing charge.

In December 2003, Santillana's estate brought a civil suit against Gomez and the City of Chicago in connection with the July 18, 2000 incident. At the trial, several witnesses testified that, contrary to the officers' account, Beyna and Martinez did not remain at the site of the initial crash with Bernal until after Gomez's subsequent collision with Santillana; rather, these witnesses testified that the officers continued to chase Gomez shortly after he sped away from the site of the first crash. One witness testified that she saw a police vehicle ram Gomez's vehicle from behind prior to colliding with Santillana. The jury also heard a recording of the police dispatcher's transmissions with Beyna, Martinez, and other officers during the events in question. The jury found that Gomez was seventy-five percent responsible for Santillana's death, and that Beyna and Martinez were twenty-five

percent responsible.  In response to a special interrogatory, the jury found that Benya and Martinez had acted wilfully and wantonly.[1]

Gomez claims that the police and the prosecutors involved in his criminal case violated his constitutional rights by failing to turn over exculpatory evidence later presented in the civil trial. In addition, he asserts that his trial counsel in the criminal case was constitutionally ineffective for failing to investigate and discover the exculpatory evidence.

## II.

"The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs federal judicial review of a petition for writ of habeas corpus from a person in custody pursuant to a state court judgment." *Collins v. Gaetz*, 612 F.3d 574, 584 (7th Cir. 2010). Although Gomez is currently on supervised release, he is still "in custody" for habeas purposes.  *Jones v. Cunningham*, 371 U.S. 236, 243 (1963).  "Under the AEDPA, a federal court may not issue a writ of habeas corpus unless the state court's adjudication of the petitioner's claim either 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an

---

[1] The City moved for a new trial but its motion was denied. It filed a notice of appeal, but the docket indicates that the appeal was dismissed by stipulation or agreement in June 2004.

unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Collins*, 612 F.3d at 584 (quoting 28 U.S.C. § 2254(d)).

## A. Police Misconduct

Gomez argues that the police violated his rights to due process and a fair trial by engaging in three forms of misconduct: (1) failing to turn over a recording made by the City's Office of Emergency Communications ("OEC") of radio transmissions during the events in question; (2) destroying his vehicle after the crash;[2] and (3) offering perjured testimony at his criminal trial.

Claims (2) and (3) are procedurally defaulted because they were not fully and fairly presented in the state court. *See, e.g.*, *Gray v. Hardy*, 598 F.3d 324, 327 (7th Cir. 2010) (petitioners in federal court must first exhaust their state remedies by fairly presenting their claims through one full round of state-court review). Although Gomez raised the latter arguments at various points during the proceedings in state court, he failed to raise either argument in either of his petitions for leave to appeal to the Illinois Supreme Court. *See, e.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (defendant's failure to present three of his federal habeas claims in his petition for leave to appeal to the

---

[2] Gomez claims that the police destroyed his vehicle because it showed evidence that he had been hit from behind by the police. As stated below, this claim is procedurally defaulted. It should also be noted that Gomez's petition presents this argument in only the most cursory fashion.

Illinois Supreme Court resulted in procedural default of those claims).  Consequently, I do not discuss the merits of these claims.

Gomez's first claim -- that the police failed to provide him with a copy of the OEC recording -- fails on the merits.  As the Seventh Circuit has explained, "[t]here is a difference between those situations in which the police fail to disclose to the defendant evidence that it knows to be material and exculpatory, and those situations in which police simply fail to preserve potentially exculpatory evidence." *United States v. Kimoto*, 588 F.3d 464, 474-75 (7th Cir. 2009).  "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009) (quotation marks omitted).  Cases involving material evidence are governed by *Brady v. Maryland*, 373 U.S. 83 (1963), and do not require a showing that the state acted in bad faith in failing to disclose it, *see, e.g.*, *Cone v. Bell*, 129 S. Ct. 1769, 1772 (2009).  In contrast, where the evidence in question is only "potentially exculpatory," a defendant can establish a constitutional violation only if he can show that the evidence was destroyed in bad faith. *Kimoto*, 588 F.3d at 475.

The state appellate court concluded that the OEC recording was only potentially exculpatory and thus was not "material" within

the meaning of *Brady*. The portion of the recording on which Gomez relies is the following:

22:12:34     He's at 31st and Lawndale right now.

             1020?

22:12:36     31st and Lawndale.

             1020?

22:12:45     1020.

             1024 is in pursuit. Tell me what you are chasing.

             -- heading eastbound at Central Park and 31st (siren heard). He's going to Central Park; he's heading eastbound; it's a 4 door ahh, I believe ahh an Impala heading eastbound. He's still going eastbound down 31st.

             All right 31st and Central Park.

             What is he chasing him for?

             What are you chasing him for?

Gomez believes that these communications show that Beyna and Martinez continued to chase him after his initial collision with Bernal at the intersection of 31st and Lawndale, thus contradicting the officers' testimony that Gomez had already collided with Santillana by the time they returned to their vehicle and proceeded to 31st and Spaulding. This argument is speculative. It assumes that the transmissions occurred just *after* the initial collision with Bernal. But it is equally consistent with the record (if not more so) to believe that the transmissions occurred while the

-6-

officers were pursuing Gomez just *prior* to his collision with Bernal. According to Beyna and Martinez, after Gomez began to flee the scene of the first crash, one of the officers (apparently Martinez, *see* Doc. 18-6 at 23) tried to follow Gomez's vehicle on foot and, when he could no longer keep up, reported via radio that Gomez was heading eastbound on 31st Street. This account is also consistent with the testimony of at least one witness who stated that he saw one of the officers talking into his shoulder radio while walking back to the police vehicle at the site of the Bernal accident. *See, e.g.*, Testimony of Jose Flores, Ex. K at 10:23-11:14 (Doc. 18-7 at 13-14). It is additionally supported by the fact that the officers do not respond to the question, "What are you chasing him for?" and do not indicate in any other way that they were pursuing Gomez in their vehicle at the time of the transmissions.

Gomez points out that the OEC recording was played for the jury in the civil case, and he claims that this explains the jury's finding that Beyna and Martinez acted wilfully and wantonly. Once again, however, this is pure conjecture. He points to no evidence that indicates to what extent (if any) the OEC recording, as opposed to other evidence presented in the civil case, influenced the jury's verdict.

For these reasons, the appellate court was not unreasonable in concluding that there was no reasonable probability that the

results of Gomez's criminal trial would have been different if the recording had been disclosed to him. As a result, the court also was not unreasonable in concluding that the OEC recording was only potentially exculpatory, and that, in order to succeed on his police misconduct claim, Gomez had to show that the police acted in bad faith. Gomez's evidence of bad faith is meager: it consists of a February 14, 2001 letter from Thomas Dugan of the OEC in response to a subpoena filed by Ray Bendig, Gomez's counsel in the criminal case, requesting all OEC communications related to the July 18, 2000 incident. In the letter, the OEC states that the recording of the dispatcher's communications cannot be produced because it had been destroyed after a period of thirty days in accordance with standard OEC policy. According to Gomez, the OEC's response is contradicted by the fact that, on September 27, 2000, Ann Collins-Dole, the City's counsel in the civil case, sent a copy of the recording to Timothy Cavanaugh ("Cavanaugh"), plaintiff's counsel in the civil suit. Doc. 18-3 at 191. According to Gomez, this shows that the recording had not in fact been destroyed, and that the police and the OEC lied in telling him otherwise.

As the appellate court observed, Gomez's argument does not follow. The record shows that Cavanaugh requested a copy of the OEC recording three days after the July 18, 2000 incident. As a result, there is every reason to believe that the copy was made during the thirty-day retention period and destroyed thereafter.

Since Bendig did not subpoena the recording until months later, on January 13, 2001, there is no reason to think that the recording still existed at that time. It is true that the copy of the recording sent by Collins-Dole to Cavanaugh was extant at the time of Bendig's subpoena. But Gomez has offered no evidence to suggest that Collins-Dole was, or should have been, aware of Bendig's subpoena asking for the recording; nor has he offered any evidence to suggest that the police were, or should have been, aware of the subpoena or that a copy of the recording existed at the time. Indeed, Gomez does not argue that Collins-Dole or the police were required to inform him of the copy's existence; he contends that the recording was never destroyed in the first place.

The appellate court was not unreasonable in concluding that the recording had in fact been destroyed and that the police had not deliberately avoided disclosing it to him. Since Gomez has not made a convincing demonstration of bad faith, his police misconduct claim fails.

**B. Prosecutorial Misconduct**

As a second ground for relief, Gomez alleges prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963). There are three "essential elements of a *Brady* prosecutorial misconduct claim: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004)(quotation marks omitted); *United States v. Price*, 418 F.3d 771, 785 (7th Cir. 2005).[3]  Gomez claims that the prosecution violated *Brady* by failing to disclose two pieces of evidence: (1) the OEC recording and (2) statements allegedly made by Rene Bernal on the night of the incident that contradicted the officers' version of events.

Gomez's argument concerning the OEC recording is essentially a restatement of the argument advanced in support of his police misconduct claim.  Gomez contends that "the State . . . was allegedly in possession of the OEC tape . . . but failed to disclose [sic] to the defense as due process requires."  Petition at 16.  He argues that it does not matter whether the prosecution

_____

[3]  As respondent notes, Resp. Br. at 42, the appellate court's opinion misstates the relevant test under *Brady* by suggesting that a violation occurs only where evidence has not been produced in response to a specific request.  *See* App. Ct. Op. at 20.  In point of fact, the Supreme Court has held that *Brady* applies even where only a general request, or indeed no request, has been made by a defendant.  *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 110-11 (1976).  However, the misstatement did not affect the court's reasoning.  Indeed, since the OEC recording was the subject of a specific request, the issue did not arise in the court's analysis.  Further, even if the court's decision had resulted in an unreasonable application of *Brady*, my conclusion would remain the same.  For this would simply require me to review Gomez's *Brady* claim *de novo*.  *See, e.g.*, *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).  For reasons already discussed, Gomez's *Brady* claim fails even without the deference required under AEDPA.

was aware that the police still had the recording since "*Brady* applies to exculpatory information known only to the police and not to the prosecutor," and "[t]he *Brady* rule . . . requires the individual prosecutor to learn of any favorable evidence known to others acting on behalf of the government in the case." Petition at 11. This argument fails because it assumes that the OEC recording still existed and that it was in the possession of the police or the OEC when the subpoena was issued. Again, Gomez does not argue that the prosecution had an obligation to discover that a copy of the recording had been made for Cavanaugh and to disclose this fact to him. He contends that the recording was never destroyed in the first place and that it remained in the possession of the police and/or the OEC. As discussed above, the appellate court reasonably rejected this claim, concluding that the recording was destroyed after a copy of it had been made and furnished to Cavanaugh.

Gomez's second argument, based on exculpatory statements allegedly made by Bernal, is similarly unavailing. Here, Gomez relies on Bernal's testimony at the civil trial that, contrary to Beyna's account, the officers began to chase Gomez in their vehicle just seconds after Gomez fled the scene of the initial crash at 31st and Lawndale. Once again, this is contrary to Beyna's and Martinez's testimony that they left the scene of the first collision only after the second collision with Santillana had

-11-

occurred.   In addition, Bernal testified that after he had described his version of events to the police, he was asked to sign a written statement which indicated, among other things, that the officers left the site of the first crash only after hearing the sound of the second.   He claimed that he told Officer Daniel Vargas, who had taken his statement, that Beyna and Martinez had pursued Gomez within seconds after Gomez sped away from the site of the first collision.   According to Gomez, the prosecution should have informed him of these statements prior to the criminal trial.

The state appellate court concluded that Bernal had not in fact made these alleged exculpatory statements at the time of the incident.   The court's conclusion was based largely on Bernal's testimony under cross-examination at the civil trial. Specifically, the court pointed out that, when asked on direct examination to identify what was inaccurate about the written statement he had signed, he replied, "[b]asically everything," and added, "this is not my statement I gave."   Doc. 18-4 at 153.   On cross-examination, however, Bernal backtracked and equivocated. After being questioned about the statement's accuracy line-by-line, he maintained that only the following sentences were inaccurate: "I heard an impact that sounded like a car accident.   I looked down the road and saw a car on fire.   The police car then went down the road where the fire was at that time."   Doc. 18-4 at 177.

Moreover, when pressed further, Bernal admitted to having made

hand-written typographical and grammatical corrections to the statement -- including corrections to the very portion of the statement that he claimed was inaccurate.  For example, he crossed out an "s" in the word "cars" so that the second in the series of allegedly false sentences would read, "I looked down the road and saw a car on fire.").  Bernal could not explain why he went to the trouble of making this comparatively trivial grammatical correction to one of the sentences if he believed that the sentence itself was untrue.  Furthermore, Bernal admitted that he had added a written comment in the space provided on the form stating that the accident could have been avoided if Gomez's car had stopped at the red light.  When asked why he would make this clarification even though the entire statement was false, Bernal was again at a loss.  And when asked why he signed the statement if he believed that it was inaccurate, he said that he had simply wanted to return home.

The appellate court also noted that Bernal admitted that he might have told the same version of events in the written statement to an assistant state's attorney during a subsequent interview. *See* Doc. 18-4 at 182.  Assistant State's Attorney Patricia Melin and Officer Vargas both testified that Bernal told them that Beyna and Martinez did not pursue Gomez after he fled from the site of the first collision; and both denied that Beyna had ever told them that his written statement was untrue.  *See* Doc 18-6 at 65 (Melin); Doc 18-6 at 120 (Vargas).

On the basis of this evidence, the appellate court concluded that the prosecution did not suppress any of Bernal's alleged exculpatory statements because there was insufficient evidence to suggest that Bernal had made the contrary statements in the first place. I cannot say that this decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, or that it involved an unreasonable determination of the facts. Accordingly, Gomez's prosecutorial misconduct claim fails.

## C. Ineffective Assistance of Counsel

Gomez's third and final argument contends that his counsel's peformance during the criminal proceedings was constitutionally ineffective. To prevail on a claim for ineffective assistance of counsel, a defendant "must demonstrate both that his counsel's performance was deficient when measured against prevailing standards of professional reasonableness, and that the deficient performance prejudiced his defense." *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). Gomez maintains that his counsel was ineffective because he failed to conduct a reasonable investigation into the case. He claims that if his attorney had investigated properly, he would have discovered five witnesses whose later testimony in the civil trial contradicted the officers' account of the events of July 18, 2000.

One problem with this argument is that, with the exception of

Bernal, Gomez does not identify any of these witnesses by name. This alone is arguably fatal to his claim. *See, e.g.*, *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."); *see also Wright v. Hedgpeth*, No. C 08-2228 SBA (PR), 2010 WL 3702444, at *12 (N.D. Cal. Sept. 15, 2010). Oddly, Gomez also failed to identify the witnesses in presenting the same argument to the appellate court. Despite the appellate court's having called attention to the problem, Gomez still has not identified the four remaining witnesses.

In proceeding to address the merits of Gomez's ineffective assistance of counsel claim, the appellate court made the most reasonable inference under the circumstances, surmising based on the proceedings in the civil case, that the witnesses in question were Bernal, Maria Hernandez ("Hernandez"), Jose Flores ("Flores"), and Espiranza Robledo ("Robledo"). (The fifth witness remains a mystery). The court concluded that, even giving Gomez the benefit of the doubt on this point, his ineffective-assistance-of-counsel claim still failed. Once again, I cannot say that this determination was unreasonable.

Gomez's argument for ineffectiveness would perhaps seem strongest in the case of Hernandez, the only witness who testified to actually seeing a police car hit Gomez's vehicle from behind before the collision with Santillana. *See* Doc. 18-5 at 32. But there is no evidence that Gomez's counsel failed to conduct a proper investigation with respect to Hernandez. On the contrary, Gomez's own testimony shows that his counsel was aware of Hernandez and that he decided for strategic reasons not to rely on her as a witness. *See, e.g.*, Doc. 18-2 at 142, 148. In his deposition, for example, Gomez noted that his attorney's judgment was based in part on the fact that Hernandez had not contacted the police after the accident, Gomez Dep. at 83:15-84:3 (Doc. 18-2 at 142).

As the Seventh Circuit has long held, "[u]sually, counsel's decision not to call a witness is a tactical choice not subject to review." *Barnhill v. Flannigan*, 42 F.3d 1074, 1078 (7th Cir. 1994); *see also United States v. Weaver*, 882 F.2d 1128, 1139-40 (7th Cir. 1999) ("It would be a rare case where counsel's conscious decision not to call a witness would amount to constitutionally ineffective assistance."). To establish ineffectiveness, Gomez would need to show that the decision not to call Hernandez was not based on his counsel's reasonable professional judgment. Gomez has presented no evidence that this was the case. *See, e.g.*, *Sallahdin v. Mullin*, 380 F.3d 1242, 1251-52 (10th Cir. 2004) ("An ambiguous or silent record is not sufficient to disprove the strong and

continuing presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.") (alteration and quotation marks omitted).

Moreover, even assuming that his counsel erred in deciding against relying on Hernandez as a witness, Gomez still would need to show that he suffered prejudice as a result. "With respect to *Strickland*'s prejudice component, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Griffin v. Pierce*, --- F.3d ----, 2010 WL 3655899, at *12 (7th Cir. Sept. 22, 2010).

Here, the appellate court reasonably concluded that the result of the trial would not have been different if Hernandez had testified. On cross-examination, for example, she ultimately admitted that, contrary to her earlier statements, she had not actually seen the police car hit Gomez's car; instead, she testified that she had seen the police car within five feet of Gomez's car and subsequently heard a collision. In addition, Hernadez was co-workers with Santillana and with Santiallana's sister, *see* Doc. 18-5 at 46-47, and her son was acquainted with Gomez, *see* Doc 18-5 at 50-51.

Moreover, Hernandez's testimony was contradicted by

-17-

substantial evidence. Two other officers, Rogelio Pinal and Ronald Rodriguez, testified that they witnessed the incident and that there were no vehicles (police or otherwise) behind Gomez at the time of the crash. Testimony of Pinal (Doc. 18-7 at 35); Testimony of Rodriguez (Doc. 18-6 at 87). The state also presented an expert witness who testified that, based on the speed and distance involved, the officers simply could not have caught up with Gomez, given the time it would have taken them to return to their vehicle and resume the chase. *See* Testimony of David Dix (Doc. 18-7 at 113-120).

Gomez's ineffective assistance claim is also unpersuasive in the case of Bernal. First, as with Hernandez, Gomez cites no evidence showing that his counsel failed to investigate Bernal. It is not enough for Gomez to point to a lack of evidence showing the his counsel performed a proper investigation. Rather, he has the burden of coming forward with affirmative evidence of his counsel's failure to investigate. *See, e.g.*, *United States v. McCaig*, 946 F.2d 897 (7th Cir. 1991) (noting that there was no evidence in the record indicating a lack of pretrial investigation and that "a blank record cuts in favor of, not against, effective assistance") (quotation marks omitted). Nor does Gomez explain why his counsel should have thought that Bernal's testimony would be helpful, since Bernal's written statement corroborated the officers' version of events. While Bernal claims to have told the police that the

statement was not accurate, we have already seen that the appellate court was not unreasonable in deciding not to credit his testimony on this point.

The two remaining witnesses whom Gomez's counsel allegedly failed to investigate are Flores and Robledo. Once again, however, the record does not show that Gomez's counsel failed to investigate these witnesses; and Gomez offers no evidence to show that his counsel should have been aware of Flores or Robledo as witnesses. Further, the appellate court concluded that even if Gomez could satisfy *Strickland*'s performance prong, he still would be unable to show prejudice resulting from his counsel's failure to call Flores and Robledo. The court opined that "at most, the additional testimony may have presented conflicting testimony as to the precise location of the police at the moment of the second collision. However, the testimony from these potential witnesses was not such that their absence from his criminal trial would 'render the trial result unreliable or the proceeding fundamentally unfair.'" App. Ct. Op. at 13 (quoting *People v. Mahaffey*, 651 N.E.2d 174, 182 (Ill. 1995)). I cannot say that this conclusion involves an unreasonable determination of the facts or that it was contrary to, or involved an unreasonable application of, clearly established federal law.

In short, Gomez has not shown that his counsel was ineffective. Gomez therefore is not entitled to habeas relief on

the basis of any of the grounds, either individually or cumulatively, asserted in his petition.[4]

III.

Under Rule 11 of the Rules Governing § 2254 Cases, a court is required to "issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant." "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it

---

[4] Although Gomez requests an evidentiary hearing, he gives no specific reason why a hearing is necessary in this case. As discussed above, the state court record is adequately developed in this case and warrants the denial of Gomez's petition. As a result, his request for an evidentiary hearing is denied. *See, e.g.*, *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

debatable whether the district court was correct in its procedural ruling." *Id.* I am unpersuaded that reasonable jurists would find debatable any of the conclusions, substantive or procedural, discussed above. Accordingly, I decline to issue Gomez a certificate of appealability.

IV.

For the reasons discussed above, I deny Gomez's petition for habeas corpus.

ENTER ORDER:

_____
Elaine E. Bucklo
United States District Judge

Dated: December 3, 2010